## ATWOOD vs. IMPSON.

1. Where a bill of sale for the machinery, tools and stock of a brick yard, for the nominal consideration of $2500 not paid, a lease of the brick yard for one year, for the nominal consideration of $100, and an agreement, under seal, by which the grantee in the bill of sale and lessee agreed to carry on the brick yard, to furnish, besides the stock specified in the bill of sale, $2000, and if necessary $2500; to furnish all labor necessary to carry on the business, and to employ the grantors at daily wages, fixed; and by which the grantee and lessee was to receive a salary of $2000 per annum and interest on moneys advanced by him, and when he should have received the money due on a mortgage on the property held by him, the cash he should have advanced in the business with interest, and his said salary, or if one of the grantors should pay him those amounts, he, was to convey to the grantor the chattels in the bill of sale, and surrender the lease and brick yard; were all executed at the same time;
*Held*—1. That they must be construed together as forming one agreement.
2. That they did not constitute a mere chattel mortgage, because there was no debt which they were intended to secure. Hence omission to file them, or make a change of possession, did not impair the right of the grantee.

2. Although a bill of sale of chattels to one who agrees to advance capital and the chattels, and carry on business with the capital and chattels, and employ the grantors at fixed wages, may have been intended by the latter

Atwood *v.* Impson.

to defraud their creditors, yet if their object was unknown to the grantee, their fraudulent intent will not affect him; nor is it sufficient to make such transfer void, that it does actually hinder and delay creditors, if such was not the object and intent of it.

3. Knowledge by the purchaser that the seller is embarrassed and largely in debt, and that, if no one would buy his goods, his creditors would get their debts out of them, will not affect the validity of the sale, provided the object in purchasing was not to delay or hinder creditors, but only to make a good bargain, or to procure something of which the purchaser was in want.

4. A sale, in making which the object of the debtor is to hinder, delay, or in any way put off his creditors, is void if made to any one having knowledge of such intent; and this knowledge need not be by actual positive information or notice, but will be inferred from the knowledge by the purchaser, of facts and circumstances sufficient to raise such suspicions as should put him on inquiry.

5. A levy by execution on partnership property for the individual debt of a partner, only binds the partner's share of the assets after partnership debts are paid. The proceeds of a sale of chattels of a partnership, levied on under such execution, were therefore applied to pay advances made by one holding a bill of sale which formed part of an agreement that he would carry on the business, made between him and the partners after the levy, in preference to the judgment.

6. The general reputation in the community where a witness is known, as to his habits in respect to telling the truth, is the only test which the law allows as to character. If he is a common liar, he is not to be believed when under oath.

7. Testimony by persons that they have heard charges against a witness, mostly as to his character for other matters beside truth and veracity, and where it appears that such charges were from persons who referred to particular transactions, is not evidence which the law permits to affect the credibility of the witness.

---

Argued upon bill, answer, replication, and proofs.

*Mr. Mitchell* and *Mr. Carpenter*, for complainant.

*Mr. F. F. Westcott* and *Mr. J. T. Nixon*, for defendants.

The bill was filed by the complainant to restrain the sheriff of Cumberland county from selling certain personal property levied on by him by virtue of executions issued against the Impsons, two of the defendants, at the suit of

the other defendants, who were the creditors of the Impsons. The complainant claims to hold the property under a bill of of sale, contract, and lease, all bearing even date, executed to him by the Impsons.

1. Although the Impsons are parties defendant, the real and substantial issue is between the complainant, and the creditors of the Impsons. These creditors aver that the conveyances, under color of which the complainant claims, were void, as having been made by and between the complainant and the Impsons, with the intent and purpose to defraud them.

Eli H. Impson, upon being called as a witness, testifies to this, and the circumstances corroborate his testimony. If the evidence is satisfactory, the law is of course clear.

2. The complainant, in his bill, claims that "the bill of sale, lease, and agreement, all bearing even date, are to be taken and considered as one instrument." We accept the case as stated by him, and, interpreting the bill of sale by the agreement, maintain that it was only intended to operate as a pledge to secure the complainant the repayment of moneys, by him to be advanced to the Impsons, and hence simply amounted to a chattel mortgage. None of these papers were ever filed in the clerk's office of the county, and the property remained in the possession of the Impsons after their execution the same as before; they were therefore void, as against these creditors, under the act respecting chattel mortgages. *Nix. Dig.* 528.

3. Two months prior to the time of the execution of the bill of sale, executions against Eli H. Impson, at the suit of Shreve and De Hart, two of these creditors, had been placed in the hands of the sheriff of Cumberland county, who immediately levied upon almost all of the goods mentioned in the bill of sale. Although the property so levied on was the partnership property of Eli and John Impson, yet the interest of Eli was bound by the levy, and he was incapable of transferring it to the complainant by the bill of sale. 1

*Parsons on Con.* 176–179; *Nix. Dig., title Execution,* 248,·
§ 3; *Cole* v. *Davis,* 1 *Lord Ray.* 724; *Lloyd* v. *Wyckoff,* 6
*Halst.* 218; *Caldwell* v. *Fifield,* 4 *Zab.* 150.

THE CHANCELLOR.

The complainant's bill is to foreclose a mortgage, and also
to restrain the sheriff of Cumberland from selling as the
property of the Impsons, personal property claimed by the
complainant, but which the sheriff had levied on, upon five
executions in his hands in favor of five other defendants.
The mortgage has been paid off and satisfied since the suit
was commenced, and the only controversy is now between
the complainant and the plaintiffs in the five executions.
The complainant claims the property by virtue of a bill of
sale from Eli H. Impson and John Impson, to whom it be-
longed, as partners under the name of E. H. and J. Impson;
this bill of sale was executed, and deed dated, February 22d,
1867, and is a sealed instrument. Two of the defendants
claim upon judgments against Eli H. Impson, on which exe-
cutions were issued and levied upon partnership property,
in December, 1866. Two claim under judgments in June,
1867, against both partners, and one under a judgment en-
tered about the same time against Eli H. Impson.

The creditors contest the validity of the bill of sale, on
two grounds—First. That it is merely a mortgage, and that
possession was not delivered immediately and the mortgage
was not filed, and therefore is void against creditors. Second.
That the sale was made for the purpose of delaying the cred-
itors of the Impsons, and therefore as against them is void.

E. H. and J. Impson were brick manufacturers, at Vine-
land, in Cumberland county. On the 22d of February, 1867,
they executed a bill of sale of all their machinery, tools, and
stock to the complainant, for the nominal consideration of
$2500, which was not paid. On the same day, they, with
the wife of E. H. Impson who owned the land, made a lease
of the brick yard to complainant for one year, from March

4th, 1867, for the nominal consideration of $100. On the same day, a written agreement under seal was made between the complainant and E. H. and J. Impson, reciting the lease and bill of sale, by which the complainant agreed to carry on the brick making, and run the yard in his own name, and to advance besides the chattels in the bill of sale, $2000, and if necessary $2500 to carry it on, and to furnish all labor and materials necessary for the successful prosecution of the business, to employ E. H. Impson as foreman, at the wages of $2.25 per day, and John Impson as workman at $2 per day; that complainant should receive $2000 per annum, salary, and lawful interest on all money advanced by him. And when complainant should have received from said business the amount due on a mortgage held by him on the property, (which is the mortgage above mentioned as paid off,) the cash he should advance in said business with lawful interest, and his salary at the rate stated, or if Eli H. Impson should at any time pay him those amounts, the complainant was to convey to E. H. Impson, the chattels in the bill of sale, and surrender the lease and brick yard to him.

These three documents were drawn to carry out an agreement made between the parties, and were executed at the same time, and therefore must be together construed as forming one agreement. It is clear that they do not constitute a mere chattel mortgage. There was no debt or obligation to pay any amount on part of the Impsons; some debt is necessary to constitute a mortgage, even if there is no legal obligation to pay it. The money to be advanced here was not to be advanced to the Impsons, but to carry on the business to which the complainant had bound himself; and although a mortgage may be made to secure future advances, yet these advances must be made to the mortgagee, or in such manner that he or some one would be liable to repay it; else there is no debt to secure. A unilateral contract to re-convey lands or goods upon payment of a sum of money is converted into a mortgage, where the transaction

is merely a loan. But here the contract is not only that he shall advance money for the business, but shall personally carry it on, and provide all materials and labor, and have a salary. The intent was to have not only his money but his care and financial skill, and the credit of his name; a large part of the goods were to be used up and consumed in carrying on the business. The transaction is very different from a mere loan of money, as the complainant not only contributed his labor and skill, but risked his capital in a business in which success was very uncertain, and in which he might have become involved in liabilities far beyond the amount stipulated; liabilities not only for debts, which perhaps he could control, but for negligence or torts by himself and his agents, which in the present state of the law, with the leaning of courts and jurors, is no small matter. Few men would risk their capital and credit in this way, without having personal control as principal or partner. The whole agreement differs entirely from a mortgage or dead unproductive pledge given to a creditor as security for ultimate payment.

The next question is whether this agreement was entered into for the purpose of defrauding creditors, with the knowledge of the complainant. If that was clearly the object of the Impsons, and it was unknown to the complainant, it will not affect him. Nor is it sufficient to make the transfer void, that it does actually hinder and delay creditors, if such was not the object and intent of it. The statute of frauds declares that all grants and conveyances devised and contrived of malice, fraud, covin, collusion, or guile, *to the end, purpose, and intent* to delay, hinder, or defraud creditors, shall be void. Many sales of merchandise, manufactured goods, or farming produce, made in the ordinary course of business, may, and do delay and hinder creditors who could have levied on them if retained a few months longer, yet these are not void. Nor would a knowledge by the purchaser, that the seller is embarrassed and largely in debt, and that if no one would buy his goods, his creditors would get their debts out of them, affect the

validity of the sale, provided the object in purchasing was not to delay or hinder creditors, but only to make a good bargain, or to procure what the purchaser was in want of.

But any sale in which the object of the debtor that prompts and determines him to make it, is to hinder, delay, or in any way put off his creditors, is void, if made to any one having knowledge of such intent; and this knowledge need not be by actual positive information or notice, but will be inferred from the knowledge, by the purchaser, of facts and circumstances sufficient to raise such suspicions as to put him upon inquiry.

The main dispute in this cause is, as to the fact whether such was the object of the conveyance to the complainant, or whether he had knowledge of that object, or of such facts and circumstances from which the law will infer notice of it. On this the testimony is directly contradictory. Eli H. Impson testifies directly that the conveyance was talked over, contrived and devised for that special purpose, between him and the complainant. The complainant distinctly and positively denies it. Both are parties to the suit, and interested in the result; the complainant to secure his money, Impson to pay his debts with it. Complainant's interest is more direct and positive. Both are parties to the alleged fraud. The complainant has both interest and reputation at stake, impelling him to deny it. Impson, by testifying to it, fixes himself with infamy, and impairs his credit as a witness. It would be dangerous to allow a solemn written instrument to be overthrown for fraud, by the unsupported evidence of a participator in that fraud. Criminal courts seldom permit a defendant to be convicted by the unsupported evidence of a participator in the crime. If the complainant, when competent, had not been sworn to contradict him, that fact would have supported the evidence strongly. He has not that support; his evidence stands alone, unsupported by any one, and contradicted by the complainant. The papers under his hand and seal are to be overcome, and the burden of proof is upon the defendants. In such case, even if the credibility of the complainant had been destroyed

by legal and convincing proof, as to his general character for truth and veracity, it would be difficult to found a decree on such evidence. It would not be difficult, if corroborated by surrounding circumstances, but here it is not.

But the proof of character is both meagre, and not such as the law requires. No one witness swears that he knows his general character for truth and veracity. They have heard something against him, mostly as to his character for other matters, beside truth and veracity, and evidently have heard them from persons who referred to particular transactions. This is not the evidence which the law permits, or should permit, to affect the credibility of a witness. With many, telling the truth is a habit and a principle which they adhere to always, though they may indulge in drinking, swearing, gambling, roystering, or making close bargains. With others, lying is the habit or principle, and if elevated to be senators or legislators, or made church members or deacons, it does not always reform them. The object of the law is to show the character of the witness as to telling the truth; general reputation in the community where he is known, is the test and the only test which the law allows as to character. If he is a common liar, he is not to be believed when under oath.

The story of Atwood about the first loan is an improbable one. He gave up good government securities yielding 7.30 per cent. interest for a six per cent. loan, secured by a second mortgage on doubtful property, with unreliable collaterals; it would impair my confidence in his veracity, if he was not supported by a respectable witness who contradicts Impson, and by the fact that the defence to the mortgage was abandoned.

If Atwood's character is not affected, then as the burden of proof is upon the defendants, the fraud is not sufficiently proved. But E. M. Turner, the conveyancer, who drew the papers, and in whose office the fraud was concocted, according to Impson, supports Atwood. His office is a room fourteen feet square, and the parties were talking in an ordinary

tone of voice, and Turner was present at the time, and joined in some parts of the conversation. He did not give his constant attention and many things may have escaped him, but it is hardly credible that he would not have heard and recollected, a deliberately devised plan to baffle creditors, discussed in the manner that this was, according to Impson. But this is not all. Turner swears positively, that the complainant inquired of Impson as to their debts, and whether if he went into the business with them, there would be creditors to interfere, and Impson answered that their debts were small, within $300 or $400, small matters. This accords with Atwood's testimony, and if true is entirely inconsistent with the story of Impson, upon which alone the design to defraud creditors rests.

The sale to the complainant must then be held valid against the subsequent creditors of the firm. But the creditors who had obtained judgments against E. H. Impson before the sale, had levied upon some of the property. At the sheriff's sale, the whole amount of sales above the price of the brick which the complainant had manufactured, was $468.66. If this had all been proceeds of the property in the bill of sale which had been levied on, as Eli only owned one seventh, the share for his creditors would only be $66.66. But a levy on partnership property for the individual debt of a partner, only binds his share of the profits after partnership debts are paid, and partnership debts for double the amount of these proceeds are shown by judgments. Besides it does not appear what property was sold, at the sheriff's sale; some of that included in the levies was not sold. The levies are very imperfect, and are not sufficient to bind anything but the five articles enumerated in the inventory. Even did not the partnership debts, to which this property must be appropriated, swallow it up, there is no sufficient proof on which any part of this money can be decreed to be paid to the plaintiffs in these two judgments of 1866.

The money in the sheriff's hands is less than the sum advanced by the complainant, and must be paid to him.